# In the United States Court of Federal Claims

No. 09-370 C

(Filed:  May 13, 2014)
_____

|  |  |
|---|---|
| NATHANIEL WAYNE GAY,<br><br>                   Plaintiff,<br><br>     v.<br><br>THE UNITED STATES,<br><br>                  Defendant. | ✳   Military pay case; Cross-motions for judgment<br>✳   on the administrative record; Standard of<br>✳   review – *Bannum*; Review of Army Board for<br>✳   the Correction of Military Records;<br>✳   Characterization of discharge; Disability<br>✳   determination; Plaintiff failed to demonstrate<br>✳   that determinations of the ABCMR were<br>✳   arbitrary and capricious, or not supported by<br>✳   substantial evidence. |

_____

### OPINION
_____

*Michael D.J. Eisenberg*, Washington, D.C., for plaintiff.

*Steven John Gillingham*, Civil Division, United States Department of Justice, Washington, D.C., with whom was Assistant Attorney General *Stuart F. Delery*, for defendant.

**ALLEGRA, Judge:**

    This military pay case is before the court on the parties' cross-motions for judgment on the administrative record.  For the reasons set forth below, the court **GRANTS** defendant's motion and **DENIES** plaintiff's cross-motion.

## I.    BACKGROUND

    The administrative record in this case reveals the following:

    Nathanial Gay (plaintiff) served in the U.S. Marine Corps from July 1, 2002, to June 10, 2003.  During this time, his medical records reveal that he was treated for various injuries, particularly to his foot, but not for any psychological ailments.  On June 10, 2003, Mr. Gay was honorably discharged from the Marine Corps due to a stress fracture in his foot.  On December 18, 2003, Mr. Gay applied to the Department of Veterans Affairs (the VA) for benefits owing to his service-related injuries.  It is unclear from the record how this claim was resolved, if at all.

    On August 31, 2004, Mr. Gay enlisted in the U.S. Army.  Medical evaluations in his enlistment documents reveal no psychiatric abnormalities.  On July 10, 2005, Mr. Gay had a

physical examination, at which time he denied feeling either suicidal or depressed.  On September 11, 2005, Mr. Gay again indicated during a medical evaluation that he was neither suicidal nor depressed.  Four days later, however, on September 15, 2005, Mr. Gay presented himself to the Behavioral Health Clinic at the Madigan Army Medical Center (Madigan) in Tacoma, Washington, for a psychiatric evaluation, claiming that he was depressed.  According to the reports from that visit, he indicated that he needed to leave the Army because he could not bear being away from his wife, that he was "depressed all the time now" and could not "concentrate on [his] job."  He also indicated that he did not like his current unit.

On December 5, 2005, Mr. Gay visited the emergency room at Madigan after he fell in the shower.  During his medical evaluation, he denied feeling suicidal or depressed.  On or about January 17, 2006, Mr. Gay failed to report to his appointed place of duty.  On March 24, 2006, Mr. Gay was referred to the Behavioral Health Clinic at Madigan for a pre-deployment soldier wellness assessment.  The referral indicated that his commanding officer was concerned about Mr. Gay's ability to manage his anger.  The neuropsychology psychometrician who conducted the evaluation reported that Mr. Gay stated that, in the past month, he had not had thoughts of suicide or self-harm, nor familial problems or depression symptoms.  The report stated that Post Traumatic Stress Disorder (PTSD) symptoms, suicidal ideation and other depression symptoms were "not a concern," but that Mr. Gay's anger and aggression issues posed a "minor concern."  Mr. Gay was released without limitations.  In April of 2006, he reenlisted in the Army.

On June 5, 2006, Mr. Gay did not report any mental health concerns during a pre-deployment health assessment.  On June 19, 2006, Mr. Gay was deployed to Iraq as part of Operation Iraqi Freedom.  On June 28, 2006, and again on July 22, 2006, Mr. Gay was cited for making threats to kill his platoon; on or about July 24, 2006, he was cited with threatening to kill his squad leader, as well as other military personnel.  These events prompted a series of remedial actions, some of which were implemented by a First Sergeant in his platoon.  Mr. Gay was referred for medical/psychological services; placed on suicide watch; had the bolt of his rifle and ammunition removed from his possession; and was transferred to a "less stressful job position."

On September 6, 2006, Mr. Gay's commanding officer referred him to the 47th Combat Support Hospital, where he was examined by psychiatrist Maj. William Keppler, MD.  According to a report by Dr. Keppler, Mr. Gay continued to suffer from stress in his personal life, as well as bouts of depression.  Despite these problems, Dr. Keppler deemed Mr. Gay "free of any delusions or hallucinations" and with "the capacity to reason and think abstractly," "exercise good judgment" and "mak[e] informed decisions about his conduct and job performance."  Dr. Keppler noted, however, that, "SPC Gay is extremely unhappy with his decision to join the U.S. Army," adding that he was "despondent over leaving his wife and daughter at home."  But, according to Dr. Keppler, Mr. Gay did "not have a treatable psychiatric condition."  Dr. Keppler determined that Mr. Gay met the retention standards for continued

service in the Army and declined to refer him to a Physical Evaluation Board (PEB).[1]  Dr.
Keppler's evaluation concluded:

> This soldier is not mentally ill.  He is responsible for his behavior and competent
> (as defined in Manual for Court Martial, R.C.M. 706, 909 and 916(k)) to
> understand and adequately participate in any administrative action you deem
> appropriate.  He should be held to the same standards of professionalism and
> military performance as any other soldier under your command.  He has decided
> that he would rather be a coal miner in Alabama than serve honorably in the U.S.
> Army.  He will remain dangerous as long as he does not get what he wants.

Mr. Gay was prescribed the drug Celexa.  Dr. Keppler recommended that Mr. Gay be denied
access to lethal means, be guarded by responsible members of his chain of command, and be
"expeditiously separated from the Army" for physical or mental conditions not amounting to a
physical disability.

On September 23, 2006, Mr. Gay accepted nonjudicial punishment for twice making
threats – once to kill one of his sergeants and, on another occasion, to kill his entire platoon.  His
rank was reduced from Specialist to Private First Class.  On October 21, 2006, Dr. Kent Roundy
saw Mr. Gay at the 399th Command Support Hospital in Mosul, Iraq.  In his notes, Dr. Roundy
cited Mr. Gay's past history of panic symptoms and depression.  He maintained the restrictions
on Mr. Gay's weapon and continued close observation by his unit.  On October 30, 2006, Mr.
Gay was again evaluated by Dr. Roundy.  In his notes, Dr. Roundy observed that Mr. Gay –

> states that he needs to be hospitalized, because he can't take the screaming and
> the work detail any longer.  He states that he needs to be hospitalized because his
> grandmother is dying, his wife is using drugs and having relations with other men.
> He indicates that he is still having difficulty at night with panic symptoms.  He is
> sleeping through the night currently.  He produces a memo from his command
> and states that it is not accurate.  The memo indicates that his report of a dying
> grandmother cannot be verified and that his brother knows nothing of this.  He
> states that he will kill himself if he has to keep doing this.  He states that
> "nobody" will help him and makes it clear that he has been to multiple sources for
> help.  It is clear on questioning that the only help he wants is to be able to return
> home and he rejects all other behavioral suggestions and ideas.  When asked
> about suicide thoughts he states that he is going to kill himself, but he cannot
> think of any way in which he might do this at this time.

---

[1]  A medical evaluation board (MEB) is "convened to document a Soldier's medical
status and duty limitations, insofar as duty is affected by the Soldier's status."  Army Reg. 635-
40 ¶ 4-10.; *see also id*. at ¶ 4-11.  If the MEB determines that the soldier does not meet retention
standards, the board recommends referral of the soldier to a PEB.  *Id*.

Dr. Roundy indicated that he believed that Mr. Gay's risk of self-harm and harm to others had increased; he continued Mr. Gay's work/duty limitations and medication.

On December 14, 2006, Mr. Gay was cited for failing to report to his appointed place of duty and making a false official statement.  That same day, Mr. Gay was seen at the Camp Taji Clinic by Dr. Edward Simmer, who conducted a psychiatric examination of him.  Dr. Simmer noted that Mr. Gay reported "being very stressed and overwhelmed by the deployment," adding that he "had depressed mood, problems concentrating, frequent headaches, lightheadedness, insomnia (sleeps 2-3 hour per night), decreased appetite, . . . anhedonia [a symptom of depression], and decreased motivation."  Dr. Simmer diagnosed Mr. Gay as having adjustment disorder with anxiety and prolonged depressed mood.  He prescribed Prozac and Ambien and continued Mr. Gay's work/duty limitations.  Dr. Simmer instructed Mr. Gay to report to the Taji Combat Stress Clinic for follow-up in four days or sooner, as needed.  On January 13, 2007, Mr. Gay disobeyed an order by a noncommissioned officer, and on January 17, 2007, was cited for being disrespectful to the same officer and failing to go to his appointed place of duty.  On January 29, 2007, he willfully disobeyed a lawful order from another noncommissioned officer.  And on February 13, 2007, he was disrespectful to another noncommissioned officer.

On February 20, 2007, Mr. Gay was seen by Dr. Edward C. Horwitz, who reported that Mr. Gay indicated that he was depressed.  On February 21, 2007, Dr. Simmer saw Mr. Gay for a follow-up visit.  Dr. Simmer reported that Mr. Gay's behavior was "normal;" that he was "fully alert" and "fully oriented;" and that while his "mood and affect" were "depressed," his thinking process was "clear" and thoughts "normal."  While Dr. Simmer found Mr. Gay to be "mentally responsible" and "psychiatrically cleared for any judicial action for misconduct, if deemed appropriate by the command," he also noted that Mr. Gay "remains suicidal, at least at times, requiring him to remain on suicide watch."  Dr. Simmer further reported that Mr. Gay had "not improved despite services provided by this Center, and he is not motivated to remain in the Army," adding that "[h]is potential for future service is poor."  On March 16, 2007, Mr. Gay had a follow-up session with a consulting physician, Maj. Anthony Leonard, MD, resulting in his being referred to the Taji Combat Stress Clinic run by Dr. Simmer.

On April 14, 2007, Cpt. Minnie Dougherty saw Mr. Gay in a mobile medical clinic, where he was diagnosed with a minor digestive ailment and interviewed concerning his anxiety disorder.  He denied having any suicidal or homicidal thoughts.  On April 14, 2007, Mr. Gay again visited a health clinic in the theater, where he saw Maj. Thomas Hatten, MD.  Mr. Gay informed Dr. Hatten that he had attempted to commit suicide the night before – the report from that visit indicates that Mr. Gay took "a bunch of [clonazepam (Klonopin)] last night," and had explained, "I felt hopeless and I wanted to end my life.  I didn't think I had any other choice."  Dr. Hatten noted that Mr. Gay had suffered frequent panic attacks, describing the circumstances, as follows –

> [h]e explained his personal issues were 'going through a divorse [sic], has a 13 mth old little girl who hasn't seen for 10 mths, friends back home are telling him his wife is doing drugs and hanging out with his daughter at a 'crack house'. Advised he has contacted mother/mother-in-law/social services/local police and is

very concerned about his daughter's welfare and not able to do anything. . . Solider advised that prior to coming into the military he started having panic attacks, just not as bad due to anxieties of having an attack while driving and would end up wrecking.  When questioned he advised has been tried on several meds, zoloft, paxil, celexa and effexor and none seemed to work.  Only has been put on current meds recently.  Did state that he had taken Xanax prior to the military and it worked well.

On a series of visits to the same health clinic between April 22, 2007, and May 21, 2007, Mr. Gay complained of various ailments, including dizziness, nasal discharge and back pain.

On June 9, 2007, one of Mr. Gay's friends, Pvt. Scott Miller, was killed by sniper fire. The record is unclear as to whether Mr. Gay witnessed the killing of his friend.  On June 24, 2007, Mr. Gay again was placed on suicide watch.  On July 2, 2007, Mr. Gay was reported as being disrespectful in deportment towards a noncommissioned officer.  On July 24, 2007, he accepted nonjudicial punishment for this offense.  His rank was reduced to Private and he was penalized $650.00 per month for two months, as well as assigned extra duty and restrictions for forty-five days.

On August 13, 2007, Mr. Gay underwent a post-deployment heath assessment.  Mr. Gay filled out forms on which he indicated that during his deployment, he took Paxil (for depression/ anxiety) and Ambien (for sleep-related problems).  He further indicated on these forms that he had not seen anyone wounded, killed, or dead during his deployment.[2]  But, he wrote that, during his deployment, he felt that he was in great danger of being killed and often felt feelings of depression, hopelessness, and "thoughts that [he] would be better off dead or hurting [him]self in some way."  On the same forms, Mr. Gay noted that his best friend (presumably Pvt. Miller) had been killed in Iraq.

On September 21, 2007, after returning from his deployment, Mr. Gay went back to the Madigan Behavioral Health Clinic, where he was evaluated by psychologist Tamela Bresler. According to Dr. Bresler's notes, Mr. Gay was "bitter" and "irritable," but was in "no acute distress," and had suffered no impairment of his thought processes.  Mr. Gay reported to Dr. Bresler that he was having several familial problems:

> [W]hile he was deployed, he and his wife started having marital problems.  Pt's wife decided to leave him and move in with another man.  Pt admits that when he found out what she was doing, he said some things that he shouldn't have.  As a result, his wife has filed a no-contact order so pt can't even see his child.  Pt denied that he would ever do anything to hurt her.  Pt also denied that he would do anything to harm himself.

---

[2]  Mr. Gay's statements on these forms directly contradict other claims he has made to the effect that he saw his best friend killed by sniper fire while in Iraq.

On September 24, 2007, Mr. Gay went to the Emergency Room at Madigan, reporting that he was unable to sleep and had been suffering frequent panic attacks since returning home from Iraq.  He was diagnosed with anxiety and discharged to his quarters, with instructions to return to the Emergency Room if he failed to improve in 48 hours.  On September 28, 2007, Mr. Gay returned to the Emergency Room at Madigan, where he received a refill of medication for his panic attacks.  A medical note from that visit indicated that Mr. Gay had not seen anyone killed or dead during his most recent deployment,[3] but that he, nevertheless, was experiencing feelings of depression and hopelessness.  He stated that he had experienced an event "that was so frightening, horrible, or upsetting" that in the past month, he had nightmares, was constantly on guard, watchful or easily startled, and felt numb or detached from others, activities, or his surroundings.

On October 11, 2007, Mr. Gay and his mother went to another medical facility at Madigan apparently because the Behavioral Health Clinic was too busy to see him.  Mr. Gay's mother reported that her son had told her that he "felt like killing himself."  But, Mr. Gay "emphatically denied" that was the case, explaining that "his soon to be ex-wife makes him so mad that he can't help what he says."  He also expressed feelings of frustration due to "the long wait to get chaptered out of the army."

During October of 2007, the Army conducted a legal review of administrative separation, noting that Mr. Gay's record "contains sufficient evidence to demonstrate a pattern of misconduct."  On October 15, 2007, his company commander, Capt. Brendan O'Hern, recommended that Mr. Gay be separated from the service under a "General (Under Honorable Conditions)" discharge, due to a pattern of misconduct.  In his memorandum, Capt. O'Hern listed out the instances on which Mr. Gay committed misconduct between June 28, 2006, and July 2, 2007.  In another memorandum, dated October 25, 2007, Capt. O'Hern noted that Mr. Gay "did virtually everything in his power to no longer perform his job and attempt to get sent home from Iraq," and he discussed the instances in which Mr. Gay had committed misconduct. Capt. O'Hern requested that the requirement or offering Mr. Gay a rehabilitative transfer be waived because it would likely "[c]reate serious disciplinary problems or a hazard to the military mission or to the soldier."

Mr. Gay consulted with military counsel and was advised of his rights, but opted not to submit a statement on his own behalf.  On November 4, 2007, Mr. Gay received a "General (Under Honorable Conditions)" discharge from the Army, at the rank of Private, based on a "pattern of misconduct."[4]

---

[3]  This note further contradicts Mr. Gay's claim that he saw his friend, Pvt. Miller, killed by sniper fire.

[4]  Defense Department and Army regulations provide that the character of service as reflected on discharge certificates shall be either "Honorable, General (Under Honorable Conditions), or Under Other Than Honorable Conditions."  Army Reg. 635–200, ¶ 3–4.a.(1); 32 C.F.R. § 45.3(d)(9) (2009).  Army regulations provide that "[c]haracterization at separation will

On July 7, 2008, the Department of Veteran's Affairs (the VA) awarded Mr. Gay a service-connected disability for post-traumatic stress disorder (PTSD), with a Veterans Administration Schedule for Rating Disabilities (VASRD)[5] rating of 30 percent disabled, effective November 20, 2007. On August 28, 2008, Mr. Gay applied to the Army Discharge Review Board (ADRB), seeking to modify his discharge status from "General" to "Honorable." Mr. Gay attributed the misconduct for which he had been discharged to his PTSD, averring in his application, "I wasn't a bad soldier [but] simply just stressed out."

On January 21, 2009, the ADRB held a hearing and, thereafter, determined that there were "no mitigating factors that would merit an upgrade of the applicant's discharge," including the "post service diagnosis of PTSD" from the VA. Citing Mr. Gay's pattern of misconduct, the ADRB found that his general discharge was "appropriate because the quality of his service was not consistent with the Army's standards for acceptable personal conduct and performance of duty by military personnel." In this regard, the ADRB observed that despite "the applicant's issues, . . . the file was [de]void of any evidence of in service PTSD or injuries sustained by the applicant while in Iraq." Finally, the ADRB noted that "the applicant's post service diagnosis of PTSD from the Department of Veterans Affairs did not overcome the reason for discharge and characterization of service granted." On January 22, 2009, the ADRB notified Mr. Gay that his request was denied and advised him that he could reapply to the ADRB for an in-person hearing, or apply to the Army Board of Correction of Military Records (ABCMR) for a correction of his records. Plaintiff took neither action.

On June 8, 2009, Mr. Gay filed a complaint in this court, in which he alleged that he was wrongfully discharged from the Army and did not receive a proper disability rating for service-connected disabilities. Mr. Gay averred that the Army's November 19, 2007, decision to discharge him was both clearly erroneous, as well as arbitrary and capricious, asserting that the decision was unsupported by his military record and contrary to the VA's award of disability benefits. On September 10, 2009, defendant moved to dismiss the complaint pursuant to RCFC 12(b)(1), for lack of subject matter jurisdiction, claiming, *inter alia*, that Mr. Gay had failed to exhaust his administrative remedies prior to filing suit in this court. On July 27, 2010, this court granted, in part, defendant's motion, dismissing, without prejudice, the portions of the complaint relating to Mr. Gay's disability retirement status. *See Gay*, 93 Fed. Cl. 681. The court advised the parties to consider whether Mr. Gay should obtain a final decision on his medical disability

---

be based upon the quality of the [member's] service, including the reason for separation." Army Reg. 635-200, ¶ 3-5.a. They further provide that: "A general discharge is a separation from the Army under honorable conditions. When authorized, it is issued to a soldier whose military record is satisfactory but not sufficiently meritorious to warrant an honorable discharge." Army Reg. 635-200, ¶ 3-7.b.(1).; *see also Gay v. United States*, 93 Fed. Cl. 681, 683 n.2 (2010).

[5] The disability rating is expressed as a percentage that represents, "as far as can practicably be determined, the average impairment in civilian occupational earning capacity resulting from certain diseases and injuries, and their residual conditions." DoDI 1332.39 (November 1996); DoDI 1332.38 ¶ E3.P4.6.

claim so that it could be rejoined with the remainder of his claims.  Heeding this advice, the parties filed a joint status report on August 20, 2010, requesting that this court remand Mr. Gay's claims for wrongful discharge claim, back pay and benefits to the ABCMR.  On September 9, 2010, this court stayed the remainder of the case and remanded the case to the ABCMR for its consideration of Mr. Gay's wrongful discharge and back pay claim, as well as "any other matters that plaintiff presents in writing to the ABCMR regarding his separation (*e.g.*, his medical disability claim)."

On May 10, 2011, Mr. Gay filed a request for reconsideration with the ABCMR, seeking "an Honorable discharge, military medical retirement or disability separation with a rating that appropriately reflects his severe service-connected [PTSD], and disability benefits back pay and interest from his date of discharge to present."  On July 12, 2011, the ABCMR denied this request.  After reviewing Mr. Gay's military records, the ABCMR found that "[t]he type of discharge directed and the reasons were appropriate considering all of the facts of the case."  The ABCMR explained –

> The governing regulations provide that no enlisted member may be referred for physical disability processing when action has been or will be taken to separate him or her for unfitness, except when the officer exercising general court-martial jurisdiction determines that the disability was the cause or substantial contributing cause of the misconduct or that circumstances warrant physical disability processing in lieu of administrative processing.  In [Mr. Gay's] case, there is no evidence showing any of his misconduct was directly caused by a medical or mental condition.  There is no evidence in [his] service medical records indicating that [he] was not rational.

Rejecting Mr. Gay's reliance on the VA rating he had received after his separation, the ABCMR further stated that –

> An award of a VA rating does not establish entitlement to medical retirement or separation from the Army.  Operating under its own policies and regulations, the VA, which has neither the authority nor the responsibility for determining medical unfitness for military duty, awards ratings because a medical condition is related to service (service connected) and affects the individual's civilian employability and/or social functioning.  The Army must find that a service member is physically unfit to reasonably perform his or her duties and assign an appropriate disability rating before he or she can be medically retired or separated.

After receiving notification of the ABCMR's decision, on September 14, 2011, this court issued an order lifting the stay.

On November 28, 2011, plaintiff filed an amended complaint with the court reasserting that defendant's actions were "arbitrary, capricious, unsupported by substantial evidence, and contrary to law."  This time, Mr. Gay specifically objected to:  (i) the Army's decision to discharge him under Honorable Conditions (General) and the ADRB's decision to deny him a

discharge upgrade; and (ii) the ABCMR's decision denying his request for a disability rating and for reconsideration of his discharge hearing.  On February 3, 2012, defendant filed a motion for judgment on the administrative record.  On March 5, 2012, plaintiff filed a cross-motion and response to defendant's motion.

On April 3, 2012, the parties moved to stay the case, pending the completion of a military investigation of certain PTSD-related diagnoses at Madigan.  On April 4, 2012, the court granted that stay.  Following the conclusion of the investigation, the court lifted the stay on March 20, 2013.  Thereafter, briefing on the cross-motions for judgment on the administrative record was completed.  Oral argument was held on January 9, 2014.

## II.   DISCUSSION

Before turning to plaintiff's claims, we begin with common ground.

### A.   Jurisdiction and Standard of Review

This court has jurisdiction over claims seeking money damages from the United States.  28 U.S.C. § 1491(a)(1).[6]  This includes actions for back pay pursuant to the Military Pay Act, 37 U.S.C. § 204, as well as actions for retirement disability benefits, 10 U.S.C. § 1201.  *See Metz v. United States*, 466 F.3d 991, 998 (Fed. Cir. 2006); *Hale v. United States*, 107 Fed. Cl. 339, 346 (2012), *aff'd*, 497 Fed. App'x 43 (Fed. Cir. 2012).  This jurisdiction extends to claims for pay and benefits that a service member would have received absent a wrongful discharge.  *See Holley v. United States*, 124 F.3d 1462, 1463 (Fed. Cir. 1997); *Hale*, 107 Fed. Cl. at 346.  The court may also order the correction of military records "as an incident of and collateral to" an award of monetary damages.  28 U.S.C. § 1491(a)(2); *see also Voge v. United States*, 844 F.2d 776, 781 (Fed. Cir. 1988).

The Federal Circuit, in *Bannum, Inc. v. United States*, 404 F.3d 1346, 1355 (Fed. Cir. 2005), instructed that courts must "distinguish . . . [a] judgment on the administrative record from a summary judgment requiring the absence of a genuine issue of material fact."  *Bannum* teaches that two principles commonly associated with summary judgment motions – that the existence of a genuine issue of material fact precludes a grant of summary judgment and that inferences must be weighed in favor of the non-moving party – do not apply in deciding a motion for judgment on the administrative record.  *Id.* at 1356.  The existence of a question of fact thus neither precludes the granting of a motion for judgment on the administrative record nor requires this court to conduct a full-blown evidentiary proceeding.  *Id.*; *see also Int'l Outsourcing Servs., LLC v. United States*, 69 Fed. Cl. 40, 45-46 (2005).  Rather, such questions

---

[6]  In his original complaint, Mr. Gay incorrectly invoked, as partial basis for this court's jurisdiction, the Administrative Procedure Act, 5 U.S.C. § 702.  This court lacks jurisdiction under the APA.  *See Lion Raisins, Inc. v. United States*, 416 F.3d 1356, 1370 n.11 (Fed. Cir. 2005) ("Of course, no APA review is available in the Court of Federal Claims."); *see also Century Exploration New Orleans, LLC v. United States*, 745 F.3d 1168, 1179 (Fed. Cir. 2014).

must be resolved by reference to the administrative record, as properly supplemented – in the words of the Federal Circuit, "as if [the Court of Federal Claims] were conducting a trial on [that] record." *Bannum*, 404 F.3d at 1354; *see also Afghan Am. Army Servs. Corp. v. United States*, 90 Fed. Cl. 341, 355 (2009).

     *Bannum*'s approach reflects well the limited nature of the review conducted in military pay cases, including board decisions involving disability benefits.  In such cases, this court will set aside the determinations only where a decision is "arbitrary, capricious, contrary to law, or unsupported by substantial evidence."  *Chambers v. United States*, 417 F.3d 1218, 1227 (Fed. Cir. 2005); *see also* 5 U.S.C. § 706(2); *Barnick v. United States*, 591 F.3d 1372, 1377 (Fed. Cir. 2010); *Houghtling v. United States*, 114 Fed. Cl. 149, 158 (2013).  In general, although the court might disagree with the ABCMR's decision, it cannot substitute its own judgment for that of the board "when reasonable minds could reach differing conclusions on the same evidence." *Heisig v. United States*, 719 F.2d 1153, 1156 (Fed. Cir. 1983); *see also Keller v. United States*, 113 Fed. Cl. 779, 787 (2013); *Verbeck v. United States*, 111 Fed. Cl. 744, 750 (2013). Nevertheless, "when a correction board fails to correct an injustice clearly presented in the record before it, it is acting in violation of its mandate" and may be viewed as acting in an arbitrary and capricious fashion. *Roth v. United States*, 378 F.3d 1371, 1381 (Fed. Cir. 2004) (quoting *Yee v. United States*, 512 F.2d 1383, 1387 (Ct. Cl. 1975)); *see also Keller*, 113 Fed. Cl. at 787; *Peoples v. United States*, 101 Fed. Cl. 245, 262 (2011); *Strickland v. United States*, 69 Fed. Cl. 684, 687 (2006).

### B.     Review of the Board's Decision

     Plaintiff challenges the two principal findings made by the ABCMR.  First, he contests the Board's determination to uphold the ADRB's decision not to recharacterize his discharge as being "Honorable."  Second, he disputes the Board's ruling denying him disability, despite the disability rating he received from the VA.  The court will consider the ABCMR's rulings on these points *seriatim*.

### 1.     Discharge Characterization

     Mr. Gay applied to the ADRB for a review of his discharge and a correction of his records.  The ADRB reviews discharges of former soldiers to determine whether they are proper and equitable.  *See* 10 U.S.C. § 1553; 32 C.F.R. § 581.2; *see also Shaw v. United States*, 100 Fed. Cl. 259, 262 (2011).  Mr. Gay requested that his discharge be upgraded to an "Honorable" discharge in light of his faithful and honorable service.  The ADRB cited Mr. Gay's pattern of misconduct while in Iraq, which included eleven incidents in barely over a year:

| Date | Conduct |
|------|---------|
| January 17, 2006 | Failing to report[7] |
| June 28, 2006 | Threat |
| July 22, 2006 | Threat |
| July 24, 2006 | Threat |
| December 14, 2006 | Failing to report |
| December 14, 2006 | False statement |
| January 13, 2007 | Disobey order of noncommissioned officer |
| January 17, 2007 | Disrespectful to noncommissioned officer |
| January 29, 2007 | Disobey order of noncommissioned officer |
| February 13, 2007 | Disrespectful to noncommissioned officer |
| July 2, 2007 | Disrespectful in deportment to noncommissioned officer |

On the basis of this pattern of misconduct, the ADRB found that plaintiff's general discharge was "appropriate." It further concluded that there were no "mitigating factors" warranting an honorable discharge, noting that Mr. Gay's post-service diagnosis of PTSD by the VA did not alter its opinion of this matter.

In the remand ordered by this court, the ABCMR sustained the ADRB's position. The ABCMR noted that Army Regulation 635-200 governs separations for enlisted personnel. Under that regulation, a general discharge is reserved for someone whose "military record is satisfactory but not sufficiently meritorious to warrant an honorable discharge." Army Reg. 635-200, ¶ 3-4.a.(1). The ABCMR noted, citing Army Reg. 634-200, ¶ 5-17.a., that commanders may approve separations on the basis of other physical or mental conditions not amounting to disability. According to the regulation cited by the ABCMR, "[s]uch conditions may include, but are not limited to . . . disorders manifesting disturbances of perception, thinking, emotional control or behavior sufficiently severe that the Soldier's ability to effectively perform military duties is significantly impaired." *Id.* at ¶ 5-17.a.(8). The same regulations define a pattern of misconduct as either "[d]iscreditable involvement with civil or military authorities" or "[d]iscreditable conduct and conduct prejudicial to good order and discipline including conduct violating the acceptable standards of personal conduct found in the UCMJ, Army regulations, the civil law, and time-honored custom and traditions of the Army." Army Reg. 635-200, ¶14-12.b.; *see also Dougharty v. United States*, 27 Fed. Cl. 436, 440-41 (1993).

The ABCMR concluded that the ADRB correctly found that plaintiff's offenses while stationed in Iraq amounted to a clear pattern of misconduct. Given the record, it is impossible for this court to contest this finding as arbitrary or capricious; to the contrary, the finding most certainly is supported by substantial evidence. Plaintiff, nevertheless, contends that the Army

---

[7] The ADRB listed this misconduct as occurring in "January 2007," but this appears to be a typographical error, as other documents appear to confirm the date above.

violated Army Reg. 635-200, ¶ 14-17.g.(1) by failing to evaluate the effect of his diagnosed mental health condition on the alleged misconduct. Plaintiff notes that under this regulation the separation authority may "[d]irect that the case be processed through medical channels, if appropriate," and that such a disposition is required if "the soldier has an incapacitating physical or mental illness that was the direct or substantial contributing cause of the conduct, and action under the UCMJ is not initiated." *Id.* But, a variety of Army officials carefully and repeatedly considered plaintiff's physical and mental state, especially the latter. While plaintiff seeks to discredit this evidence, claiming that the various examinations significantly predated his discharge from the Army, that contention is contradicted by the record. Many of the reports made by medical professionals, such as Drs. Keppler and Simmer, in fact occurred during the period in which plaintiff was committing many of his various infractions.[8] Moreover, his examination by Dr. Bresler, in which she concluded that he had no impairment of his thought process, occurred immediately after the last of these infractions. Based on the record, the court must sustain the ABCMR's finding that Mr. Gay's medical situation was neither the direct, nor a substantial contributing cause, of his misconduct. *See Joslyn v. United States*, 110 Fed. Cl. 372, 392 (2013) (the "question is not whether substantial evidence weighs against the [ABCMR's] decision but whether substantial evidence supports it").

There is no indication, moreover, that the Army committed any procedural violations in processing Mr. Gay for discharge. As discussed below, the ABCMR correctly held that the Army did not err in discharging Mr. Gay without referring him to a MEB or a PEB to determine his fitness for duty. To be sure, Mr. Gay's medical records are filled with reports that he struggled with stress, anxiety, depression, thoughts of suicide, and panic attacks, as well as a variety of physical conditions related to his stress. And it was apparent that Mr. Gay was extremely unhappy to be in Iraq, far away from his family. Nevertheless, the ABCMR carefully reviewed his records, which included a number of statements by Army physicians, including psychiatrists, indicating that Mr. Gay did not have a treatable psychiatric condition, was rational, fully alert, thinking clearly and mentally responsible. While the court is sympathetic to the distress plaintiff undoubtedly experienced while he was deployed, it is in no position to disturb the well-supported findings of the ABCMR.

### 2. Disability

Substantial evidence also supports the ABCMR's decision not to alter Mr. Gay's military disability status. In the ordinary course, medical disability claims are first considered by a MEB,

---

[8] Plaintiff argues that his case is like *Boyle v. United States*, 101 Fed. Cl. 592 (2011). In that case, this court remanded a matter back to the ABCMR because the board and a general court-martial convening authority had erred in failing to determine whether there was a causal connection between a service-member's PTSD and his misconduct. In that case, however, the service member was diagnosed with PTSD while he was still in the military. 101 Fed. Cl. at 594. Such is not the case here. It is also worth noting that on remand the ABCMR found that the servicemember's PTSD was not a direct cause of his misconduct – a finding that this court held was supported by substantial evidence. *See Boyle v. United States*, 107 Fed. Cl. 114 (2012).

which reviews the individual's medical records when a question arises as to a soldier's ability to perform his duties because of a physical disability. *See* Army Reg. 635-40, ¶ 4.6. - 4.8.; *see also Meidl v. United States*, 114 Fed. Cl. 607, 609 (2014). Then, if the disability is found to be permanent, the matter is referred to the PEB, which provides a formal fitness and disability determination. If the PEB finds the service member unfit for duty and permanently disabled, it assigns a disability rating. *Barnick v. United States*, 591 F.3d 1372, 1375 (Fed. Cir. 2010). Depending upon the disability rating, a service member is entitled to disability retirement or a lump-sum disability severance payment. *Id.*

Army Regulation 635-40, however, provides that no enlisted member may be referred for physical disability processing when action has begun to separate him for unfitness. In this regard, paragraph 4-3 of the Army regulations stated, during the years in question, that "[e]xcept as provided below, an enlisted Soldier may not be referred for, or continue, physical disability processing when action has been started under any regulatory provision which authorizes a characterization of service of under other than honorable conditions." Army Reg. 635-40 ¶ 4-3.a. The exception referenced in this provision stated that "the commander exercising general court-martial jurisdiction over the Soldier may abate the administrative separation," if the commander finds that:

> (1) The disability is the cause, or a substantial contributing cause, of the misconduct that might result in a discharge under other than honorable conditions.
>
> (2) Other circumstances warrant disability processing instead of alternate administrative separation.

*Id.* at ¶ 4-3.b.; *see also Hale*, 107 Fed. Cl. at 347. In this case, plaintiff's commanding officer determined that he did not qualify under either of the exceptions above. *See also* Army Reg. 635-40 ¶ 3-2.b.(2).

The ABCMR sustained that determination. It noted that there was substantial evidence that plaintiff's misconduct was not caused by his medical or mental condition. This evidence included the documentation provided by Mr. Gay's medical providers while in the service. As the ABCMR noted, the fact that Mr. Gay qualified for a VA-disability rating relating to his PTSD did not alter its view of the matter because the MEB/PEB process is unrelated to the process employed by the VA in affording a veteran a disability rating. Through the MEB/PEB process, the Army evaluates whether a service member's disability caused his unfitness for his service. *See* Army Reg. 635-40 ¶ 3-2.b. By contrast, the VA is concerned only with whether the disability was caused or aggravated by service and impairs the veteran's civilian life. *See* 38 C.F.R. § 3.303(a) (defining "service connection"). Though the rating systems are similar, they often produce disparate results.[9] Here, various Army officials did not

---

[9] *See Lockwood v. United States*, 90 Fed. Cl. 210, 219 (2008) ("[b]oth the Department of Veterans Affairs and the military service branches rely on the [VASRD], however, they do so in different ways"); *Stine v. United States*, 92 Fed. Cl. 776 (2010), *aff'd*, 417 Fed. Appx. 979 (Fed.

find that Mr. Gay was unfit to perform his duties reasonably. That finding is supported by substantial evidence.

The ABCMR is empowered to review applications for the presence of an error or injustice and to make recommendations for corrective action. 10 U.S.C. § 1552(a)(1); 32 C.F.R. § 581.3 (setting out the policies, procedures, and governing rules of the ABCMR); *see also Duhon v. United States*, 198 Ct. Cl. 564, 568 (1972). Plaintiff argues that the board, in this case, failed to correct an injustice clearly presented in the record and essentially punished him for his service-connected mental health issues. An "injustice" for purposes of the ABCMR review statute is "treatment by the military authorities that shocks the sense of justice." *Sawyer v. United States*, 18 Cl. Ct. 860, 868 (1989), *rev'd on other grounds*, 930 F.2d 1577 (Fed. Cir. 1991); *see also Reale v. United States*, 208 Ct. Cl. 1010 (1976), *cert. denied*, 429 U.S. 852 (1976). There is no indication of that here. The record, in fact, contains substantial evidence to the contrary, some of which directly contradicts plaintiff's key factual claims, such as his assertion that he saw his best friend killed by sniper fire. The court is not in a position to reconsider the evidence in the record and draw its own conclusions. The fact that a reasonable person might have reached a different conclusion is insufficient to overturn the decision of a board. *Heisig*, 719 F.2d at 1156; *Houghtling*, 114 Fed. Cl. at 159. The board's decision must be upheld as long as there is substantial evidence to support its action and there is no other indication that its decision was arbitrary or capricious. That is the case here.

## III.    CONCLUSION

The court need go no further. The court is mindful of the enormous burdens placed on the shoulders of service members, like Mr. Gay, who have defended this nation. But, it cannot ignore the law and the facts of this case, which require that the decisions of the ABCMR be sustained. Based on the foregoing, the court **GRANTS** defendant's motion for judgment on the administrative record and **DENIES** plaintiff's cross-motion. The Clerk is hereby ordered to dismiss plaintiff's case. No costs.

**IT IS SO ORDERED**.

s/Francis M. Allegra
Francis M. Allegra
Judge

---

Cir. 2011) ("[a] rating disparity between the two systems is not unusual because of the differing standards that must be applied").